IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| Michael Whetstone, | ) | |
| James Whetstone, & | ) | |
| Alton Whetstone, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cv-00050-Z-BV |
| | ) | |
| Officer Charles Wheeler, individually, | ) | |
| Officer Randy Rice, individually, | ) | |
| Officer Jacob Cochran, individually, | ) | |
| Officer Dan Harris, individually, | ) | |
| Unidentified Officer #3, individually, | ) | |
| Officer Armando Adame, individually, & | ) | |
| Officer Colby Copeland, individually, | ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME Plaintiffs in the above-captioned matter, by and through counsel, and hereby file their brief in opposition to Defendants' motion for summary judgment. (Doc. #32–34). For the reasons set forth below, Defendants' motion should be denied.

### SUMMARY

For Michael, all three *Graham* factors cut against finding qualified immunity. Michael committed no crime. He was trying to surrender, and thus did not pose an immediate threat to the safety of the officers or others. Additionally, he was not actively resisting or attempting to evade by flight.

Considering the totality of the circumstances, one can see that Michael was surrounded by no fewer than six armed and shielded/protected law enforcement officers and at least two law enforcement vehicles—one tactical vehicle and one truck. All officers had their weapons drawn. A police helicopter hovered overhead, with dozens of additional officers and an additional tactical

1

vehicle (and multiple other police vehicles) also on the property. Michael was saying nothing, and his hands were raised. It was also broad daylight, so any reasonable officer could have and should have seen that Michael—80-years-old on the day of the incident—was elderly.

The *Solis* case relied on by Defendants is completely inapplicable, as that involved the quintessential qualified immunity situation—a lone officer at night during a traffic stop approaching a vehicle with a greater number of occupants. Further, Defendants' argument about the man in the crane posing a threat to Defendants does not hold water. The crane was surrounded by police officers, and Defendants were in constant contact with those officers. There is also a genuine dispute of material fact as to whether the crane was even within the line of sight of the area where Michael was taken into custody, thereby casting doubt on that entire claim by Defendants.

For James and Alton, again all three *Graham* factors cut against finding qualified immunity. At the time of the incident with Defendant Harris, James and Alton were not under arrest for any crime; they were detained while a search warrant was being executed. James and Alton surrendered peacefully and allowed officers to handcuff them with hands behind their back, thereby posing no threat to anyone. Additionally, not following instructions from Defendant Harris—in this case to walk faster—is not the same as active resistance or trying to evade by flight.

On Defendant Harris' body camera video, the interaction with James and Alton can be heard but not seen. Further, nothing definitive can be drawn from Defendant Copeland's video pertaining to the interactions with James, Alton, and Defendant Harris. On this point, one need only look to Defendant Harris' own words, where he admits to elbowing both James and Alton in the head, which is an interaction not captured on Defendant Copeland's video.

For all these reasons, there is a genuine dispute of material fact as to whether Defendants' conduct violated Plaintiffs' clearly established constitutional rights. Defendants are not entitled to qualified immunity and this case should proceed into further discovery.

## TABLE OF CONTENTS

Table of Authorities ……………………………………………………………  4

Summary Judgment Evidence ………………………………………………..  5

Background ………………………………………………………………….  6

    Background on Michael, James, and Alton Whetstone …………………………  6

    Background on the Raid ……………………………………………………..  6

    Interactions Between Defendant and Michael Whetstone ………………………  8

    Interactions Between Defendant Harris and James and Alton Whetstone ………  12

Standard of Review ………………………………………………………… 14

Law ………………………………………………………………………… 14

    42 U.S.C. § 1983 (generally) ………………………………………………  14

    Excessive Force ………………………………………………………………15

    Bystander Liability ……………………………………………………………16

    Qualified Immunity …………………………………………………………..16

Argument ……………………………………………………………………  17

    Excessive Force (Michael Whetstone) ……………………………………..  17

    Bystander Liability (Michael Whetstone) ……………………………………  22

    Qualified Immunity (Michael Whetstone) ……………………………………  23

    Excessive Force (James and Alton Whetstone) …………………………………24

    Qualified Immunity (James and Alton Whetstone) …………………………..  28

Conclusion …………………………………………………………………  29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635 (1987) …………………………………………    16

*Barnes v. Felix*, 145 S. Ct. 1353 (2025) ………………………………………….    15

*Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008) ……………………………………    28

*Celotex Corp. v. Catrett*, 477 U.S. 317(1986) ………..………………………    5

*Graham v. Connor*, 490 U.S. 386 (1989) ……………………………….....…    15, 17, 18, 22, 23, 24,

                                                                                                              26, 27, 28

*Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995) ……………………………………    16, 23

*Hamilton v. Kindred*, 845 F.3d 659 (5th Cir. 2017) …………………………    16, 22

*Hope v. Pelzer*, 536 U.S. 730 (2002) ………………………………………    16, 24

*Joesph on Behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020) ….    16, 24

*Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013) ………………………..    14, 15, 16, 25–26, 28

*Solis v. Serrett*, 31 F.4th 975 (5th Cir. 2022) ……………………………………    18–19, 24

*Spiller v. Harris County, Texas*, 113 F.4th 573 (5th Cir. 2024) ………………    14, 15, 17, 24, 27

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005) ………………………..    23, 28

*Westfall v. Luna*, 903 F.3d 534 (5th Cir. 2018) ……………………………………    14, 17, 23, 27, 28

**Statutes**

42 U.S.C. § 1983 …………………………………………………………………    14

**Rules**

Fed. R. Civ. P. 56 …………………………………………………………………    5, 14

Fed. R. Evid. 803 …………………………………………………………………..    5

Fed. R. Evid. 901 …………………………………………………………………..    5

Fed. R. Evid. 902 …………………………………………………………………..    5

## SUMMARY JUDGMENT EVIDENCE

Plaintiffs' motion to rely on evidence in Defendants' appendix was granted. (Doc. #37). As such, this brief cites some materials in Defendants' appendix. Plaintiffs hereby designate the following additional materials in opposition to Defendants' motion; the below materials are submitted separately through Plaintiffs' appendix.[1]

| Ex. | Description | App. Page No. |
|-----|-------------|---------------|
| 1 | Stills from Defendant Adame Body Camera | 1–6 |
| 2 | Stills from Def. Ex. J. Potter County Body Camera X6039B8GJ | 7–10 |
| 3 | Stills from Defendant Copeland Body Camera | 11–14 |
| 4 | Stills from Lt Cole Nuckols Body Camera | 15–18 |
| 5 | Alton Whetstone Medical Record Excerpt | 19–23 |
| 6 | James Whetstone Medical Record Excerpt | 24–25 |
| 7 | Michael Whetstone Medical Record Excerpt | 26–31 |
| 8 | James Whetstone Declaration | 32–33 |
| 9 | Charging Documents re: James and Alton | 34–39 |
| 10 | Alton Whetstone Declaration | 40–41 |

---

[1]    Plaintiffs' response primarily relies on the body camera footage and the stills from the body camera footage, both of which can be authenticated through Defendants or Plaintiffs, as well as the other officers present. *See generally* Fed. R. Evid. 901; Fed. R. Civ. P. 56, committee notes to 2010 amendment (explaining that, at summary judgment, a proponent needs to present admissible material or simply "explain the admissible form that is anticipated."). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.").

As Defendants show, the body cameras can also be authenticated as business records. *See* Fed. R. Evid. 803(6) and 902(11).

For medical records, Plaintiffs anticipate the records themselves will be admissible pursuant to Fed. R. Evid. 803(6), and statements made by Plaintiffs within those records will be admissible pursuant to Fed. R. Evid. 803(3) and/or 803(4). *See also* Fed. R. Evid. 902(11).

Information from declarations (and police report narratives) will be admissible through testimony of the authors.

## BACKGROUND

Background on Michael, James, and Alton Whetstone (collectively "Plaintiffs").

1. On August 11, 2023, Michael was 80-years-old. (Pltf Ex. 7, Michael Whetstone Medical Record Excerpt, App. 27; Pltf Ex. 8, James Whetstone Declaration, App. 33). As of this date, Michael suffered from documented and significant hearing loss. (Pltf Ex. 7, Michael Whetstone Medical Record Excerpt, App. 28; Pltf Ex. 8, James Whetstone Declaration, App. 33).

2. On August 11, 2023, James was 60-years-old. (Pltf Ex. 6, James Whetstone Medical Record Excerpt, App. 25; Pltf Ex. 8, James Whetstone Declaration, App. 33).

3. On August 11, 2023, Alton was 57-years-old. (Pltf Ex. 5, Alton Whetstone Medical Record Excerpt, App. 20; Pltf Ex. 8, James Whetstone Declaration, App. 33).

Background on the Raid.

4. On August 11, 2023, Defendants and other law enforcement officers executed a search warrant of the property located at 413 NW 4th St, Dumas, Texas 79029 (hereinafter "the property" or "the Whetstone Junk Yard"). (Def. Ex. A, Randall County Sheriff's Office Incident Reports, App. 2).

5. The search warrant was obtained on August 11, 2023, based on a supporting affidavit that alleged drug activity at the property. (Def. Ex. B, Search Warrant, App. 13–14; Def. Ex. C, Affidavit in Support of Search Warrant, App. 16–18 and 15).

6. The search warrant execution (hereinafter "the raid") involved no fewer than five law enforcement agencies, two armored trucks or tactical vehicles, multiple other law enforcement vehicles, a helicopter, and approximately 30 law enforcement officers. (Def. Ex. L, Potter County

Sheriff's Office Incident Reports, App. 33[2] and 37–39; Pltf Ex. 4, Stills from Nuckols Body Camera, App. 16; Pltf Ex. 2, Stills from Def. Ex. J Body Camera, App. 8).

7.    The armored trucks involved in the raid are depicted below:



(Pltf Ex. 4, Stills from Nuckols Body Camera, App. 16).



(Pltf Ex. 2, Stills from Def. Ex. J Body Camera, App. 8).

8.    The officers involved in the raid were dressed in full tactical gear, including body armor, helmets, riot shields, and assault rifles. (*See generally* Def. Ex. D–G and I–K, Videos).

---

[2]    The author was with the Potter County Sheriff's Office Special Response Team (SRT), and also listed the following assisting agencies: Dumas Police Department, Potter County SRT, Randall County SWAT, and Moore County SRT. (The Texas Department of Public Safety was not listed but it is the entity that provided the helicopter support).

9.  Throughout much of the raid, officers had riot shields engaged and weapons drawn, as below:



(Pltf Ex. 1, Stills from Adame Body Camera, App. 2).



(Pltf Ex. 3, Stills from Copeland Body Camera, App. 14).

10. During the raid, Defendants and other law enforcement officers encountered Plaintiffs. (Def. Ex. E, Copeland Body Camera Video, App. 20, 1:59–6:46 (15:05:48–15:10:35)).

Interactions Between Defendants and Michael Whetstone.

11. During the raid, Michael drove down to one end of the property at an extremely low rate of speed. (Def. Ex. E, Copeland Body Camera Video, App. 020, 5:28–5:56 (15:09:16–15:09:44)).

12. A law enforcement vehicle—a truck separate and apart from the tactical vehicles present—approached Michael's vehicle, physically stopping it. (Def. Ex. E, Copeland Body Camera Video, App. 20, 5:51–5:56 (15:09:40–15:09:44)).

13. With his vehicle stopped, Michael put his hands up as he was closed in upon by multiple armed officers with weapons drawn and shields engaged, with one such officer yelling words to the effect of, "I will f****** kill you." (Def. Ex. D, Adame Body Camera Video, App. 19, 11:24–12:27 (15:09:29–15:10:32); Def. Ex. E, Copeland Body Camera Video, App. 20, 5:54–6:01 (15:09:43–15:09:50)). This moment is depicted below:



(Pltf Ex. 1, Stills from Adame Body Camera, App. 3).

14. At this point in time, Michael was surrounded by no fewer than six armed and shielded/protected law enforcement officers and two law enforcement vehicles—one tactical vehicle and one truck. (Def. Ex. D, Adame Body Camera Video, App. 19, 11:24–12:27 (15:09:29–15:10:32); Def. Ex. E, Copeland Body Camera Video, App. 20, 5:28–6:44 (15:09:16–15:10:33)).

15. Michael was then ripped out of the vehicle by Defendant Wheeler and dragged along the ground by his arm, as depicted below:





(Pltf Ex. 1, Stills from Adame Body Camera, App. 4–5; Def. Ex. D, Adame Body Camera Video, App. 19, 11:24–12:27 (15:09:29–15:10:32)).

16. Defendants Rice and Cochran took custody of Michael after he was ripped from the vehicle by Defendant Wheeler. (Def. Ex. G, Nuckols Body Camera Video, App. 22, 3:53–4:06 (15:10:16–15:10:29)).

17. As Defendants Rice and Cochran became involved, Michael was screaming in pain and yelling, with his hands restrained (handcuffed) behind his back. (Def. Ex. G, Nuckols Body Camera Video, App. 22, 3:53–4:06 (15:10:16–15:10:29)).

18. Despite Michael's screams, Defendants Rice and Cochran hoisted Michael by his arms and dragged him upright along the ground, as depicted below:



(Pltf Ex. 3, Stills from Copeland Body Camera, App. 13).[3]



(Pltf Ex. 4, Stills from Nuckols Body Camera, App. 17).[4]



---

[3]    Depicted above, Defendant Rice is on the left; Defendant Cochran is on the right.

[4]    Depicted above, Defendant Rice is on the right; Defendant Cochran is on the left.

(Pltf Ex. 1, Stills from Adame Body Camera, App. 6).

19. As Michael was screaming, unable to move due to pain and injuries, Defendant Rice yelled at Michael words to the effect of, "Get your f****** legs moving!" (Def. Ex. G, Nuckols Body Camera Video, App. 22, 3:53–4:06 (15:10:16–15:10:29)).

20. At this point, a supervisor—Lieutenant Cole Nuckols of the Randall County Sheriff's Office—intervened and said, "Easy, guys. [physically intervened] Easy." (Def. Ex. G, Nuckols Body Camera Video, App. 22, 3:53–4:06 (15:10:16–15:10:29)).

21. Even after Lieutenant Nuckols intervened, Defendant Rice is heard saying, "Get your f****** a** moving." (Def. Ex. G, Nuckols Body Camera Video, App. 22, 3:53–4:06 (15:10:16–15:10:29)).

<u>Interactions Between Defendant Harris and James and Alton Whetstone.</u>

22. During the raid, James and Alton were detained in handcuffs by Defendants and other officers, as depicted below:



(Pltf Ex. 3, Stills from Copeland Body Camera, App. 12; Def. Ex. E, Copeland Body Camera Video, App. 20, 2:05–2:50 (15:05:54–15:06:39) and 3:35–4:07 (15:07:24–15:07:56)).

23. Defendants and other officers then decided to move James and Alton to a different location. (Def. Ex. G, Nuckols Body Camera Video, App. 22, 1:37–1:48 (15:08:01–15:08:12)).

24. To accomplish this move, Defendant Harris escorted James and Alton while they were still in handcuffs, with hands restrained, i.e., handcuffed, behind their backs. (Def. Ex. F, Harris Body Camera Video, App. 21, 8:50–9:25)).

25. When James and Alton were apparently not moving as quickly as desired by Defendant Harris, Defendant Harris said words to the effect of, "Walk faster." (Def. Ex. F, Harris Body Camera Video, App. 21, 8:50–9:25; Pltf Ex. 8, James Whetstone Declaration, App. 33).

26. Alton then informed Defendant Harris that he was physically disabled, saying words to the effect of, "'I'm handicapped, man." (Def. Ex. F, Harris Body Camera Video, App. 21, 8:50–9:25; Pltf Ex. 8, James Whetstone Declaration, App. 33).

27. Defendant Harris responded by saying words to the effect of, "I'm going to throw you on the f****** ground if you don't do what I say." (Def. Ex. F, Harris Body Camera Video, App. 21, 8:50–9:25; Pltf Ex. 8, James Whetstone Declaration, App. 33).

28. At this point, an altercation ensued. During the altercation, Alton can be heard saying words to the effect of, "Hey, I'm crippled man, I'm handicapped," with James immediately saying, "Me too, dude." Alton also told Defendant Harris to "quit" in reference to Defendant Harris attempting to move them more quickly than they were physically able to move. (Def. Ex. F, Harris Body Camera Video, App. 21, 8:50–9:25; Pltf Ex. 8, James Whetstone Declaration, App. 33).

29. While many of the relevant interactions during the raid were captured clearly on body cameras, the interaction between Defendant Harris and James and Alton was not captured clearly on body cameras. It can be heard through Defendant Harris' body camera. (Def. Ex. F, Harris Body Camera Video, App. 21, 8:50–9:25)). The interaction is also partially captured on Defendant Copeland's body camera. (Def. Ex. E, Copeland Body Camera Video, App. 20, 4:30–4:50 (15:08:19–15:08:39)).

30. Additional facts are incorporated below as necessary.

## STANDARD OF REVIEW

31. Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

32. "When a public official makes a good-faith assertion of qualified immunity, that alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Spiller v. Harris County, Texas*, 113 F.4th 573, 575–76 (5th Cir. 2024) (quotations omitted). "As is normal for summary judgment, the plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. However, unique to the qualified immunity context, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law." *Id.* (quotations and citations omitted).

33. All facts and reasonable inferences are construed in favor of the plaintiff as the non-moving party. *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013). In very narrow situations where the plaintiff's version of events is "blatantly contradicted" by video evidence, such that no reasonable jury could believe the plaintiff, they may not be entitled to the benefit of construing all facts and reasonable inferences in their favor. *Id.* at 374–75. However, that is a "demanding" or "difficult" standard to meet. *See Westfall v. Luna*, 903 F.3d 534, 548–49 (5th Cir. 2018). Application of that standard is reserved for "exceptional" cases. *Spiller v. Harris County, Texas*, 113 F.4th 573, 576 (5th Cir. 2024).

## LAW

<u>42 U.S.C. § 1983 (generally).</u>

34. A person who, under color of state law, deprives another person of a constitutional or federal right may be held liable. *See* 42 U.S.C. § 1983.

Excessive Force.

35. To establish unconstitutional excessive force, a plaintiff "must show: (1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (quotation omitted). *See also Spiller v. Harris County, Texas*, 113 F.4th 573, 576 (5th Cir. 2024) (stating that "a violation of the Fourth Amendment occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force.") (quotation omitted).

36. As recently summarized by the Supreme Court: a claim that a law enforcement officer used excessive force during a stop or arrest is analyzed under the Fourth Amendment, and the "touchstone" of the Fourth Amendment is reasonableness, as measured in objective terms. *See Barnes v. Felix*, 145 S. Ct. 1353, 1357–58 (2025). Reasonableness is analyzed by looking at the totality of the circumstances. *Id.* at 1358.

37. In assessing reasonableness, courts apply the so-called *Graham* factors. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.") (quotations and citations omitted).

38. "While a suspect's refusal to comply with instructions may indicate that physical force is justified, officers must also select the appropriate *degree* of force. To stay within constitutional bounds, an officer must use force with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance. Therefore, force may be less justified or

unjustified when a suspect engages in passive resistance, as opposed to active resistance." *Joesph on Behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 332–33 (5th Cir. 2020) (cleaned up) (emphasis in original).

Bystander Liability.

39. An officer may be liable pursuant to § 1983 under a theory of bystander liability where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017). *See also Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) ("The district court correctly held that an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983.").

Qualified Immunity.

40. "The doctrine of qualified immunity protects public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. To determine whether a public official is entitled to qualified immunity, [courts] decide (1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. A right is clearly established when it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (quotations and citations omitted).

41. Regarding the second prong of the inquiry, "the very action in question" need not have previously been held unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). However, the government official is entitled to "fair notice." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

## ARGUMENT

42. There is a genuine dispute of material fact as to whether Defendants' conduct violated Plaintiffs' clearly established constitutional rights. As such, Defendants are not entitled to qualified immunity and this case should proceed into further discovery.

<u>Excessive Force (Michael Whetstone)</u>

43. In counts 1–3, Michael alleges excessive force against Defendants Wheeler, Rice, and Cochran. Excessive force occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force. *See Spiller v. Harris County, Texas*, 113 F.4th 573, 576 (5th Cir. 2024).[5] The inquiry ultimately comes down to reasonableness, which is determined based on the *Graham* factors.

44. The first *Graham* factor is the severity of the crime at issue. This clearly favors Michael because he was not arrested and has not been charged with any crime whatsoever stemming from August 11, 2023, the day of the incident. (Pltf Ex. 8, James Whetstone Declaration, App. 33). Put simply, Michael committed no crime. Defendants highlight that Michael drove his vehicle from one end of the property to the other, but—at worst—that *might* be some type of obstruction or interference offense (if Michael could hear, which he could not), which the Fifth Circuit has repeatedly found to be a minor crime in the *Graham* factor analysis. *See Spiller v. Harris County, Texas*, 113 F.4th 573, 576–77 (5th Cir. 2024); *see also Westfall v. Luna*, 903 F.3d 534, 547–48 (5th Cir. 2018).

45. The second *Graham* factor also favors Michael because he did not pose an immediate threat to the safety of the officers or others. Michael was actively trying to surrender. Michael's vehicle was stopped, having come to a rest after a very, very slow speed drive from one end of the property to the other. (Def. Ex. E, Copeland Body Camera Video, App. 20, 5:28–5:56

---

[5] Defendants concede Michael was injured. (Def. Brief, Doc. #33, p. 22, ¶ 40). Thus, injury is not discussed further.

(15:09:16–15:09:44); Pltf Ex. 1, Stills from Adame Body Camera, App. 3). And Michael's hands were raised as he was surrounded by armed officers. (Def. Ex. D, Adame Body Camera Video, App. 19, 11:24–12:27 (15:09:29–15:10:32); Pltf Ex. 1, Stills from Adame Body Camera, App. 3). As such, the second *Graham* factor strongly favors Michael.

46. As to the third *Graham* factor, Michael was not actively resisting nor attempting to evade by flight. Quite the opposite, in fact. For count 1 against Defendant Wheeler, Michael was actively trying to surrender as discussed in the prior paragraphs. For counts 2 and 3 against Defendants Rice and Cochran, Michael was handcuffed, screaming in pain, and unable to walk after having been ripped from his vehicle. (Def. Ex. G, Nuckols Body Camera Video, App. 22, 3:53–4:06 (15:10:16–15:10:29)). Again, this factor favors Michael.

47. Throughout their brief, beginning with arguments related to Michael, Defendants rely on *Solis v. Serrett*, 31 F.4th 975 (5th Cir. 2022). However, *Solis* is almost the complete opposite of this case's fact scenario. To begin, *Solis* involved a traffic stop in which the officer was initially outnumbered—one officer and two vehicle occupants. 31 F.4th at 978–79. The occupants were suspected of being intoxicated. *Id.* One of the occupants (the passenger and eventual plaintiff) was answering questions for the other occupant (the driver). *Id.* When the officer asked the driver to step out of the vehicle, the passenger began filming and also stepped out of the vehicle. *Id.* A second officer eventually arrived, the occupants became more non-compliant, and they were arrested. *Id.* During the arrest, the eventual plaintiff was taken to the ground and had her arm pulled behind her back while handcuffs were placed on her. *Id.* at 979. Notably upon a review of the videos linked in the Fifth Circuit's opinion, it was night time (just after 12:00am). *Id.* at 978, n. 1.

48. *Solis* involved the quintessential qualified immunity situation—a lone officer late at night during a traffic stop approaching a vehicle with a greater number of occupants. Further, in reading the

18

*Solis* facts, it is obvious the plaintiff was acting in a hostile and highly provocative manner (filming the officer, asking for the officer's badge number, speaking over the officer, etc.). Nothing about the *Solis* facts is similar to the present case except for the eventual § 1983 claim.

49. Perhaps recognizing this hurdle, Defendants highlight that another Whetstone family member ran into a crane (allegedly with something in his hand), and that this "escalating danger created an urgent necessity to quickly detain Michael[.]" (Def. Brief, Doc. #33, p. 24, ¶ 42). Defendants' argument is essentially that, because another person was in a crane hundreds of yards away, Defendants' fear (or concern about increased danger) justified the amount of force they used on Michael. That argument lacks merit.

50. In watching the videos, it is apparent that the officers were in constant communication with one another. (*See, e.g.,* Def. Ex. G, Nuckols Body Camera Video, App. 22, 2:44–2:50 (15:09:07–15:09:14)). This is noted throughout the police reports as well, specifically, with the helicopter communicating down to ground officers about the suspect in the crane. (Def. Ex. A, Randall County Sheriff's Office Incident Reports, App. 2 and App. 8; Def. Ex. L, Potter County Sheriff's Office Incident Reports, App. 34 and App. 37–39). Given the constant communication, there was no realistic possibility of any Defendant, or any other officer, being cut off or exposed in an open area. Indeed, there was an *entire team* from Potter County with its attention focused on the crane. (Pltf Ex. 2, Stills from Def. Ex. J, App. 9). And there was a *sniper* watching the man in the crane. (Def. Ex. A, Randall County Sheriff's Office Incident Reports, App. 2).

51. Further, the Court can see for itself that the man in the crane, once detained, was shirtless with his waist band exposed; the item in the hand was (unsurprisingly) a phone. (Pltf Ex. 2, Stills from Def. Ex. J, App. 10; Def. Ex. J, Potter County Body Camera X6039B8GJ Video, App. 0027, 10:18–11:20 (15:15:29–15:16:31)). This cuts against any claim that a reasonable officer would

have been in fear (or concerned about increased danger) due to the man in the crane being armed, which is the argument Defendants are making.

52. The Court can also see how Michael, in his truck, turned the corner to approach Defendants and the rest of the Randall County officers that eventually took him into custody. (Def. Ex. E, Copeland Body Camera Video, App. 20, 5:20–5:36 (15:09:09–15:09:25)). At the very least, there is a genuine dispute of material fact as to whether the crane was even within the line of sight of the area where Michael was detained; indeed, from the various body cameras, the crane does <u>not</u> appear to be within the line of sight of that area. Again, this cuts against any claim that a reasonable officer would have been in fear (or concerned about increased danger) due to the man in the crane, which is the argument Defendants are making.

53. Finally, to perhaps belabor the point, one can watch Defendant Harris' body camera footage and compare it to timehacks on other body camera videos. (Def. Ex. F, Harris Body Camera Video, App. 21, 12:03–13:04). When doing so, it is abundantly clear that multiple Randall County officers were standing out in the open, near the area Michael was taken into custody moments before, while the man in the crane was still in the crane. Indeed, they are discussing the man in the crane.

54. Another way to think of it is that the man in the crane was not taken into custody until about 15:16:08, by Potter County officers:



(Pltf Ex. 2, Stills from Def. Ex. J, App. 10). Yet four minutes earlier at 15:12:04, just moments after Michael was taken into custody and *while the man in the crane was still in the crane*, this was the Randall County team:



(Pltf Ex. 4, Stills from Nuckols Body Camera, App. 18). Yet again, this cuts against any claim that a reasonable officer would have been in fear (or concerned about increased danger) due to the man in the crane, which is the argument Defendants are making.

55. Considering the totality of the circumstances in the present case, one can see that Michael was surrounded by no fewer than six armed and shielded/protected law enforcement officers and at least two law enforcement vehicles—one tactical vehicle and one truck. All officers had their

weapons drawn. A police helicopter hovered overhead, with dozens of additional officers and an additional tactical vehicle (and multiple other police vehicles) also on the property. Michael was saying nothing, and his hands were raised. It was also broad daylight, so any reasonable officer could have and should have seen that Michael—80-years-old on the day of the incident—was elderly.

56. Applying the *Graham* factors and considering the totality of the circumstances, while also construing all facts and reasonable inferences in favor of Michael, there is a genuine dispute of material fact whether excessive force was committed against him.

<u>Bystander Liability (Michael Whetstone)</u>

57. In counts 7 and 8, Michael alleges bystander liability claims against Defendants Adame and Copeland. Bystander liability occurs when an officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017).

58. The body camera footage shows that Defendants Adame and Copeland were positioned with direct views of the unconstitutional excessive force being committed against Michael, yet they did nothing to intervene or protect him. (Def. Ex. D, Adame Body Camera Video, App. 19, 11:24–12:27 (15:09:29–15:10:32); Def. Ex. E, Copeland Body Camera Video, App. 020, 5:28–6:44 (15:09:16–15:10:33). They sat idly by despite having a reasonable opportunity to intervene and stop the harm; this triggers § 1983 liability. Perhaps the most telling piece of evidence is when a fellow officer—Lieutenant Cole Nuckols of the Randall County Sheriff's Office—sees what is occurring and quickly intervenes. (Pltf Ex. 4, Stills from Nuckols Body Camera, App. 17). Lieutenant Nuckols saw and acted; Defendants Adame and Copeland saw and ignored. This further demonstrates that there is a genuine dispute of material fact as to whether

Defendants Adame and Copeland, who were even more closely positioned than Lieutenant Nuckols with unobstructed views, should have done the same.

Qualified Immunity (Michael Whetstone)

59. Prong one of the qualified immunity analysis favors Michael for the reasons discussed above. *See supra.* At the very least, there is a genuine dispute of material fact as to whether a constitutional rights violation occurred.

60. As to the second prong, Defendants' argument that the rights were not clearly established lacks merit. *Graham* was decided in 1989, making it decades old on August 11, 2023, the date of the incident giving rise to this lawsuit. *See, e.g., Westfall v. Luna*, 903 F.3d 534, 549 (5th Cir. 2018) (explaining that, at the time of the incident, the plaintiff "had a clearly established right to be free from excessive force, and it was clearly established that the permissible degree of force depends on the *Graham* factors. Accordingly, we reverse the district court's grant of qualified immunity[.]") (citations omitted). *See also Tarver v. City of Edna*, 410 F.3d 745, 753–54 (5th Cir. 2005) (citing *Graham* for the proposition that, in 2001, there was a constitutional right to be free from excessive force).

61. Additionally, for the bystander liability claims, the Fifth Circuit has recognized this § 1983 theory of liability—that an officer who is present and does not take reasonable measures to protect a suspect from another officer's use of excessive force—for decades. *See, e.g., Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citing case law dating back to 1976). If any Defendant did not believe they could be held liable for using excessive force—or for standing idly by while their colleagues used excessive force—such a belief would have been patently unreasonable on August 11, 2023.

62. Further, in terms of the second prong of the qualified immunity analysis, the Supreme Court has clearly stated that the specific action in question need not have previously been held unlawful; it

is simply a matter of fair notice. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Even accepting Defendants' argument that Michael failed to comply with the officers' instructions, any reasonable officer knew or should have known (i.e., had fair notice) that failure to comply with instructions is not a license for assault and battery. *See, e.g., Joesph on Behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 336 (5th Cir. 2020) (finding excessive force was used when officers beat a man who was not suspected of a crime and who, while not following instructions, was not actively resisting). Accordingly, the constitutional rights at issue in this case were clearly established, and Michael thus satisfies the second prong of the qualified immunity analysis.

Excessive Force (James and Alton Whetstone)

63. In counts 4 and 5, James and Alton allege excessive force against Defendant Harris. Excessive force occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force. *See Spiller v. Harris County, Texas*, 113 F.4th 573, 576 (5th Cir. 2024).[6] The inquiry ultimately comes down to reasonableness, which is determined based on the *Graham* factors.

64. The first *Graham* factor is the severity of the crime at issue. This factor favors James and Alton. At the time of the incident with Defendant Harris, James and Alton were not under arrest for any crime. They were detained while a search warrant was being executed. (Pltf Ex. 3, Stills from Copeland Body Camera, App. 12). The search warrant was obtained based on potential drug activity at the property. (Def. Ex. B, Search Warrant, App. 13–14; Def. Ex. C, Affidavit in

---

[6]     As *Solis* explains, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Solis v. Serrett*, 31 F.4th 975, 981–82 (5th Cir. 2022). *See also Spiller v. Harris County, Texas*, 113 F.4th 573, 578 n.7 (5th Cir. 2024) (rejecting a dissent argument about supposed lack of injury and noting that pain and fear are enough).

Defendants' motion does not challenge injury to James or Alton. As such, any argument by Defendants that James or Alton were not injured should be waived. To remove any doubt, however, James and Alton both suffered "some injury." (Pltf Ex. 5, Alton Whetstone Medical Record Excerpt, App. 20 and App. 22; Pltf Ex. 6, James Whetstone Medical Record Excerpt, App. 25; Pltf Ex. 8, James Whetstone Declaration, App. 33; Pltf Ex. 10, Alton Whetstone Declaration, App. 41).

Support of Search Warrant, App. 16–18 and 15). James and Alton did eventually face charges related to drugs, and Alton also faced a firearm charge. (Pltf. Ex. 9, Charging Documents re: James and Alton, App. 34–39). However, James and Alton were not arrested or charged for anything related to their interaction with Defendant Harris, which is the issue at hand.

65. Second, James and Alton did not pose an immediate threat to the safety of anyone. They surrendered peacefully; they complied with directions about where to stand; and they allowed the officers to handcuff them with their hands behind their backs. (Def. Ex. E, Copeland Body Camera Video, App. 20, 2:05–2:50 (15:05:54 –15:06:39) and 3:35–4:07 (15:07:24–15:07:56)). As with Michael, one must also consider the totality of the circumstances: it was broad daylight; James and Alton were surrounded and heavily outnumbered by armed and shielded officers with weapons drawn; and there was a massive presence of police vehicles, including tactical vehicles and helicopter support.

66. Third, James and Alton were not actively resisting nor attempting to evade by flight. Not following instructions, in this case to walk faster, is not the same as active resistance or trying to evade by flight. On this factor, *Ramirez v. Martinez*, 716 F.3d 369 (5th. Cir. 2013), is factually similar. In *Ramirez*, the defendant and other officers arrived at the plaintiff's business to execute an arrest warrant for the plaintiff's sister-in-law. *Id.* at 372. The officers had guns drawn. *Id.* The plaintiff approached the defendant and asked what was happening, and a verbal altercation followed. *Id.* The defendant told the plaintiff to, "Turn around and put your hands behind your back!" *Id.* The plaintiff did not comply, and the plaintiff pulled his arm away when the defendant grabbed it. *Id.* The defendant then tased the plaintiff and forced him to the ground. *Id.* at 372–73. The defendant and other officers are heard telling the plaintiff to "stop resisting" and to "get on the ground." *Id.* at 373. The defendant then tased the plaintiff a second time while the plaintiff was in handcuffs on the ground. *Id.* The district court denied the defendant's summary

judgment motion on the plaintiff's excessive force claim, which the Fifth Circuit upheld on appeal. *Id.* at 379.

67. Like *Ramirez*, this case involves a warrant being served at a property that was <u>not</u> for the arrest of the plaintiff; in *Ramirez*, the arrest warrant was for the plaintiff's sister-in-law, and in this case it was a search warrant that did not seek anyone's arrest. Like *Ramirez*, this case involves officers serving the warrant with weapons drawn. Also like *Ramirez*, this case involves a verbal altercation, which then led to a physical altercation. And finally, like *Ramirez*, this case involves force being applied by the defendant <u>after</u> the plaintiff has been placed in handcuffs. When faced with very similar facts, the Fifth Circuit in *Ramirez* concluded that, "Viewing the facts of this record in the light most favorable to [the plaintiff], any reasonable officer in [the defendant's] place would have recognized [the defendant's] conduct was objectively unreasonable under the *Graham* factors." *Id.* at 378. This Court should adopt a similar analysis and find there is a genuine dispute of material fact as to whether Defendant Harris engaged in excessive force against James and Alton.

68. In their brief, Defendants seek to make much of the video from Defendant Copeland, and the limited portion of the interaction with James, Alton, and Defendant Harris caught on such video. (Def. Brief, Doc. #33, p. 29, ¶ 55). However, when viewing Defendant Copeland's video, nothing definitive whatsoever can be drawn from it pertaining to the interactions with James, Alton, and Defendant Harris. Most notably, the majority of the interaction is completely omitted from Defendant Copeland's video, as someone is either blocking the video or Defendant Copeland is turned in the other direction. (Def. Ex. E, Copeland Body Camera Video, App. 20, 4:30–4:42 (15:08:19–15:08:31)). The tail end of the interaction is caught on video, albeit as Defendant Copeland is running and the video is bouncing in and out of view; however, this is nowhere near the type of blatant contradiction in facts—a demanding standard reserved for

exceptional cases—that would warrant a deviation from the rule that James and Alton receive the benefit of all inferences. *See Westfall v. Luna*, 903 F.3d 534, 548–49 (5th Cir. 2018). *See also Spiller v. Harris County, Texas*, 113 F.4th 573, 576 (5th Cir. 2024).

69. To further support this point—that nothing definitive can be drawn from Defendant Copeland's video pertaining to the interactions with James, Alton, and Defendant Harris—one need only look to Defendant Harris' words, where he admits elbowing both James and Alton in the head:

> They were only taking steps when I pushed them forward so they would keep their balance. Both males were pushing back against me and not following commands to walk. The male in the red shirt pushed his shoulder back into my chest and at this point I delivered a distractionary strike with my left elbow to his right ear to prevent him from pushing me further and to make him walk forward. The male in the grey tank top then turned towards me, took an aggressive stance, puffed his chest out and cocked his head back as if he were going to strike me with it or spit on me. At this point I delivered a distractionary blow with my right elbow to his left ear area to prevent any assault on me. Both males refused to walk forward and were taken by perimeter units that had ran to my location to assist me. I returned to the bearcat where a red Chevrolet

(Def. Ex. A, Randall County Sheriff's Office Incident Reports, App. 9). These elbows are not captured on Defendant Copeland's video, nor are they seen on Defendant Harris' video, but they are undisputed to have occurred.

70. While the elbows are not disputed, nor is it disputed that James and Alton had their hands restrained behind their backs, the remaining details of the interaction are absolutely disputed. For instance, James described seeing Defendant Harris force Alton down to the ground, at which time Defendant Harris struck James in the head. (Pltf Ex. 8, James Whetstone Declaration, App. 33). Alton describes a similar interaction of being struck in the head. (Pltf Ex. 10, Alton Whetstone Declaration, App. 40–41). These are clearly at odds with Defendant Harris' version.

71. For the reasons stated above, applying the *Graham* factors and considering the totality of the circumstances, while also construing all facts and reasonable inferences in favor of James and Alton, there is a genuine dispute of material fact whether excessive force was committed against them.

Qualified Immunity (James and Alton Whetstone)

72. Prong one of the qualified immunity analysis favors James and Alton for the reasons discussed above. *See supra*. At the very least, there is a genuine dispute of material fact as to whether a constitutional rights violation occurred.

73. As to the second prong, Defendants' argument that the right to be free from excessive force was not clearly established lacks merit. *Graham* was decided in 1989, making it decades old on August 11, 2023,  the date of the incident giving rise to this lawsuit. *See Westfall v. Luna*, 903 F.3d 534, 549 (5th Cir. 2018) (explaining that, at the time of the incident, the plaintiff "had a clearly established right to be free from excessive force, and it was clearly established that the permissible degree of force depends on the *Graham* factors. Accordingly, we reverse the district court's grant of qualified immunity[.]") (citations omitted). *See also Tarver v. City of Edna*, 410 F.3d 745, 754 (5th Cir. 2005) (citing *Graham* for the proposition that, in 2001, there was a constitutional right to be free from excessive force). If any Defendant did not believe they could be held liable for using excessive force, such a belief would have been patently unreasonable on August 11, 2023.

74. Additionally, *Ramirez* is very factually similar to the present case—involving an officer, after verbal escalation, using force against someone who was restrained. *Ramirez v. Martinez*, 716 F.3d 369, 378–79 (5th Cir. 2013). *Ramirez* was decided in 2013, well before August 11, 2023, the date of the incident giving rise to this lawsuit. Further, *Ramirez* discussed another similar case decided in 2008. *See Bush v. Strain*, 513 F.3d 492, 501–02 (5th Cir. 2008). Accordingly, the constitutional right at issue in this case was clearly established, and James and Alton thus satisfy the second prong of the qualified immunity analysis.

## CONCLUSION

WHEREFORE, for the reasons argued above, there is a genuine dispute of material fact as to whether Defendants' conduct violated Plaintiffs' clearly established constitutional rights. Defendants are not entitled to qualified immunity and this case should proceed into further discovery.

Respectfully submitted for Plaintiffs,

/s/Ross A. Brennan
Cronauer Law, LLP
7500 Rialto Blvd, Bldg 1, Ste 250
Austin, TX 78735
512-733-5151
ross@cronauerlaw.com

-and-

Blake Scott
Attorney Dean Boyd PLLC
4423 SW 45th Ave
Amarillo, TX 79109
806-242-3333
blake@deanboyd.com