IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

MICHAEL WHETSTONE, *et al.*,

Plaintiffs,

v.

CHARLES WHEELER, *et al.*,

Defendants.

2:25-CV-050-Z-BV

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion for Summary Judgment on the issue of Qualified Immunity ("Motion"), filed September 30, 2025. ECF No. 32.[1] Plaintiffs responded on October 14, 2025. ECF No. 38. Defendants replied on October 28, 2025. ECF No. 42. The Motion is now ripe.

For the reasons below, Defendants are entitled to qualified immunity as to all of Plaintiffs' allegations. Accordingly, the Motion (ECF No. 32) is **GRANTED**. Plaintiffs' claims against Defendants are **DISMISSED**.

**BACKGROUND**

**I. The Search Warrant at Whetstone Junk Yard**

Plaintiffs Michael Whetstone and his sons James and Alton Whetstone live at a property they call the "Whetstone Junk Yard." ECF No. 20 at 1–5; Pl. Ex. 8. at 3. The property is known to be a location for consistent criminal activity, including multiple instances of aggravated assault with a deadly weapon. Def. Ex. H. An aerial image of the property taken the day of the incident in question is below:

[1] This Motion was filed by all Defendants except Unidentified Officer #3. In this Memorandum Opinion and Order, "Defendants" means the Defendants who filed this Motion, *i.e.* all Defendants *except* Unidentified Officer #3.



Ex. I at 05:03.

On August 11, 2023, a judge issued a search warrant for the Whetstone Junk Yard. Def. Ex. B. A confidential informant informed a Dumas police officer that Plaintiffs James and Alton Whetstone were distributing narcotics from the Whetstone Junk Yard. Def. Ex. C. Following up on this tip, the confidential informant completed a controlled buy at the Whetstone Junk Yard. *Id.* The search warrant was issued soon thereafter. Def. Ex. B.

Later that day, Defendants executed the search warrant at the Whetstone Junk Yard. ECF No. 20 at 3. The search warrant was considered "high-risk," at least in part because of the size of the property, the number of people there, and the possibility that the people there would have weapons. Def. Ex. B at 2 (Lt. Cole Nuckols Incident Report). Accordingly, Randall County SWAT, along with Moore County and Potter County tactical teams, helped the Dumas Police Department execute the search warrant. *Id.* A Texas Department of Public Safety helicopter provided overhead surveillance while police executed the search warrant. *Id.*; *see* ECF No. 20 at 3 ("The search warrant execution . . . involved no fewer than five law enforcement agencies.").

### II. Officers Detain Alton and James Whetstone

Randall County SWAT entered the Whetstone Junk Yard from the south in an armored vehicle. *See* ECF No. 33 at 3–4. Body camera footage shows they immediately encountered a man in a red cutoff shirt standing outside of a trailer. Def. Ex. D at 07:30–55. That man was Plaintiff Alton Whetstone ("Alton").[2] ECF No. 20 at 16. He was apprehended and handcuffed by Defendant Colby Copeland. Def. Ex. E at 2:10–45. Alton appears to resist by attempting to go to the ground while Copeland is handcuffing him. *Id.* at 2:15–25 ("Hands behind your back. I didn't say sit— Get up. Get up!"). But other than this minor incident, Alton's initial apprehension was uneventful—he does not allege Copeland or any other officer used excessive force during his initial apprehension. *See generally* ECF No. 20. After handcuffing him, Defendant Copeland placed Alton behind the armored vehicle. Def. Ex. E at 02:25–03:20.



ECF No. 20 at 16.

---

[2] The Plaintiffs in this action share a last name. For clarity and brevity, the Court refers to the Plaintiffs by their first name.

Shortly after Copeland apprehended Alton, a man wearing a gray cutoff shirt approached the armored vehicle. Def. Ex. E at 03:23–40. That man was Plaintiff James Whetstone ("James"). ECF No. 20 at 13–14. James complied with all orders during his initial apprehension. Def. Ex. E at 03:40–04:10. Copeland also handcuffed James and placed him beside his brother behind the armored vehicle. *Id.*



ECF No. 20 at 14.

Lieutenant Cole Nuckols then ordered Defendant Dan Harris to move Plaintiffs Alton and James to a different location. Def. Ex. G at 01:35–47. Alton and James appear to comply with Harris's order to "come with me" at first. Def. Ex. G. at 01:40–50; Def. Ex. E at 04:20–25.

What happens next is disputed between the parties.[3] In his incident report, Defendant Harris says Alton and James began "planting their feet and not walking forward when I was

[3] The available body camera footage is partially obscured during Defendant Harris's interaction with Alton and James. Def. Ex. E at 04:29–50; Def. Ex. F at 08:50–09:25.

telling them to." Def. Ex. A at 9. Lieutenant Nuckols's body camera footage supports Defendant Harris on this point. When Nuckols turns briefly toward Harris escorting Alton and James, Alton can be seen planting his feet and pushing back against Defendant Harris. Def. Ex. G at 2:00–06.



Def. Ex. G at 02:04.

According to Harris, after Alton pushed his shoulder back into Harris's chest, Harris struck Alton's right ear with left shoulder in a "distractionary strike." Def. Ex. B. at 9. The other Plaintiff James then "took an aggressive stance, puffed his chest out and cocked his head back as if he were going to strike" or "spit on" Harris. *Id.* So Harris struck James's left ear with his right elbow in another "distractionary blow" to prevent a potential assault. *Id.* Eventually, Alton and James were secured by other officers who ran to help Harris. *Id.*

Plaintiffs' version of events is quite different. They claim Defendant Harris was ordering them to walk faster than they can move due to preexisting physical disabilities. Pl. Ex. 8 (James Whetstone Declaration); Pl. Ex. 10 (Alton Whetstone Declaration). Audio from

Defendant Harris's body camera footage supports this part of Plaintiffs' claim. Harris ordered Alton and James to "walk faster," then exclaimed "I'm going to throw you on the f****** ground if you don't do what I say!" Def. Ex. F at 08:55–09:07. Alton then says "I'm crippled man, I'm handicapped" and James chimes in "Me too dude!" *Id.* at 09:07–13; *see also* ECF No. 20 at 17. James declares that Harris then kicked Alton's legs, bringing him to his knees, and tried to get him all the way on the ground. *Id.* Alton, describing the altercation differently, declares it was Harris's elbow to his head that brought him to the ground. Pl. Ex. 10. Alton says Harris then dragged him along the ground. *Id.*[4] The parties agree Harris then elbowed James in the head. *See* Pl. Ex. 8. Alton and James allege Harris used excessive force in violation of the Fourth Amendment. ECF No. 20 at 13–18.

According to Plaintiffs, Unidentified Officer #3 then intervened. ECF No. 20 at 18. This officer "repeatedly struck [Alton] in his legs, knees, arms, back, shoulders, and head, both while [Alton] was upright and while he was on the ground." *Id.* When Alton stood back up, Unidentified Officer #3 allegedly struck his legs again, driving him back to the ground. *Id.* The interaction with Unidentified Officer #3 does not appear to be visible in any of the available body camera footage. Plaintiffs claim Unidentified Officer #3 "committed excessive force against Plaintiff Alton Whetstone in violation of the Fourth Amendment." *Id.* at 19.

Alton and James submitted excerpts of medical records related to the injuries they sustained during the events described above. James Whetstone was taken to a doctor for medical clearance the day of the altercation. Pl. Ex. 6. His examining physician noted "[h]e has minimal pain and trace bleeding with some surrounding dry blood." *Id.*

[4] Still images from Defendant Copeland's body camera refute Alton's narrative—Alton appears to remain on his feet through the entire altercation with Harris. Def. Ex. M. Even if he went to the ground briefly, he was certainly not on the ground long enough for Harris to "drag him." *Id.*

It is unclear if Alton was taken to a doctor the day of the search. But four days later, he reported to the emergency room complaining of pain in his shoulder, left leg, and a headache. Pl. Ex. 5. His physician noted no symptoms "concerning for traumatic head injury" and X-rays of his leg indicated "no acute fractures." *Id.* Alton was prescribed medication to relax his shoulder muscles, reduce inflammation, and help with his headache. *Id.*

**III. Officers Detain Michael Whetstone**

A second police unit—Potter County's tactical team—entered the Whetstone Junk Yard from the north in its own armored vehicle. Def. Ex. J. at 01:10–30. They immediately encountered a man wearing overalls in a red and white pickup truck. *Id.* at 01:30–02:08. That man was Plaintiff Michael Whetstone ("Michael"). ECF No. 20 at 6–12.

The Potter County tactical team deployed loud sirens and ordered Michael to stop moving over the vehicle's intercom. Def. Ex. J at 01:30–40 ("Sir, stop where you are. Sir, stop where you are! Sheriff's Office!"). Michael did not comply with these instructions and entered the red and white pickup truck. *Id.* at 01:40–50 ("[He's] getting into the vehicle!"). Continuing to ignore instructions to stop, Michael drove the truck to a red shed. *Id.* at 01:50–02:25.[5] About one minute later, Michael turned the truck around and drove past the Potter County tactical team toward the Randall County SWAT unit, again ignoring commands from the Potter County tactical team to stop. *Id.* at 03:25–04:05 ("Stop your truck and put your hands in the air!").

While the Potter County tactical team was interacting with Michael, the Randall County SWAT unit was assessing a threat from another man (not a Plaintiff here) who climbed into a crane on the property. *See* Ex. I at 07:00–09:45 (Texas Department of Public Safety helicopter unit informing units on the ground about a man hiding in the crane).

[5] Michael then probably locked the door to the red shed. *Compare* Def. Ex. I at 06:30–50 (the door to the red shed is open), *with* Def. Ex. J. at 12:25–40 (the door to the red shed is locked).

Lieutenant Nuckols ordered Defendant Harris to use an unmarked police truck to provide a "block" for a unit clearing another area of the property from a potential shooter in the crane. Def. Ex. G at 02:35–45. As seen in the image below, the boom of the crane was in the line of site from the location where the Randall County SWAT unit was gathered by their armored vehicle:




Def. Ex. E at 05:09 (notice the boom of the crane in the center of the image).

While this threat assessment was ongoing, Michael drove the red and white truck toward the Randall County SWAT unit. Def. Ex. E at 05:20–36. Lieutenant Nuckols fired a "less lethal 40 mm" round near the truck, and another team member threw a "distraction device that landed on the left driver's side of the door"—both attempts to convince Michael to voluntarily stop the truck. *See* Pl. Ex. A at 2 (Lieutenant Nuckols's Incident Report); Def. Ex. E at 05:45–48; Def. Ex. G at 02:55–03:20. But Michael kept driving toward the SWAT unit. He did not stop until Defendant Harris drove the unmarked police truck head on into Michael's red and white truck and stopped him near the SWAT unit's armored vehicle. Def. Ex. D at 11:24–41; Def. Ex. E at 05:46–56.[6]

[6] Both trucks were moving slowly when they collided.




Def. Ex. E at 05:55.

After Defendant Harris stopped Michael's truck, members of the SWAT unit quickly approached Michael while he was still in the vehicle. Def. Ex. D at 11:40–44. Michael raised his arms with his palms facing in toward himself, but did not exit the vehicle. *Id.* A SWAT member opened the door of Michael's truck, and Defendant Charles Wheeler aggressively pulled Michael by his left arm out of the truck and onto the ground, continuing to pull him a short distance away from the truck. *Id.* at 11:44–50; *see also* ECF No. 20 at 6–7.




ECF No. 40 at 10.

Another SWAT member handcuffed Michael while he was on the ground and yelling in pain. Def. Ex. D at 11:50–12:10. Concerned about the potential threat from the man still in the crane, other members of the SWAT unit stood between the officers apprehending Michael and the crane. Def. Ex. G at 03:20–35 (members positioning themselves between Michael and the crane; someone says "Watch the crane."). At least one of these members was using a shield to protect himself and those behind him, as seen in the image below:



Def. Ex. D at 12:09.

Michael suffered injuries to his "knees, arms, back, shoulders, neck, and head" from being pulled out of the truck. ECF No. 20 at 7–8. These injuries resulted in a "multi-day hospitalization." *Id.* Michael alleges Defendant Wheeler's actions in pulling him out of the truck amounted to excessive force in violation of the Fourth Amendment. *Id.* at 9.

Defendants Randy Rice and Jacob Cochran took custody of Michael after he was handcuffed, with one defendant holding each of his arms. ECF No. 20 at 9–13. As Michael continued to yell in pain, Rice and Cochran aggressively lifted him off the ground, dragging him upright a short distance to move him to a different area. Def. Ex. D at 12:07–15; Def. Ex.

G at 03:48–55. Michael almost immediately fell back to the ground, which caused Rice to yell "Keep your f******* legs moving!" Def. Ex. G at 03:55–58; ECF No. 20 at 10. Lieutenant Nuckols approached and deescalated the situation. Def. Ex. G at 03:58–04:02 ("Easy, guys. Easy, easy."). Rice and Cochran then drag Michael a short way, eventually pulling him to his feet and escorting him away from the area. Def. Ex. E at 06:35–43.



ECF No. 20 at 9, 12.

Michael claims that Rice and Cochran's conduct caused injuries to his "knees, arms, back, shoulders, neck, and head." ECF No. 20 at 10, 12. These injuries, in conjunction with the injuries caused when Defendant Wheeler pulled Michael out of the truck, led to a "multi-day hospitalization." *Id.* at 11, 13. Michael alleges Rice and Cochran's conduct amounted to excessive force in violation of the Fourth Amendment. *Id.* Michael also alleges that two officers—Defendants Armando Adame and Colby Copeland—are liable as bystanders because they saw other Defendants committing excessive force violations against him and did not intervene. *Id.* at 19–21.

**LEGAL STANDARD**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law," and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Brown v. City of Hou., Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." (citing *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003))).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)). While the moving party is not required to negate each element of the nonmoving party's case, it can meet its burden by demonstrating the "absence of facts supporting the elements" of the nonmoving party's causes of action. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986)).

## ANALYSIS

### I. Excessive Force Claims

Plaintiffs allege various Defendants used excessive force against them in violation of the Fourth Amendment. ECF No. 20. Defendants assert the defense of qualified immunity. ECF Nos. 23, 24. Qualified immunity "alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (internal marks omitted).

While the Plaintiffs bear the burden of proof, the Court still "view[s] the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (citation omitted). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). When video of the incident in question is available, and a party's version of events is "utterly discredited" by the video evidence, the Court should "view[] the facts in the light depicted by the videotape." *Id.* at 380–81.

Qualified immunity involves a two-step inquiry: (1) "whether the officer violated a constitutional right"; and (2) "whether the right at issue was clearly established at the time of the alleged misconduct." *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (Oldham, J.) (internal marks omitted). Because the burden is on the Plaintiffs, they "must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (citation omitted). Plaintiffs bear the burden to establish a genuine fact issue at both steps of

the qualified immunity inquiry. *See Joseph v. Bartlett*, 981 F.3d 319, 328–30 (5th Cir. 2020). If they cannot do so at either step, the Defendants are entitled to qualified immunity. *See id.*

### A. *Whether Defendants Used Excessive Force*

The Court begins by considering the first prong of the qualified immunity analysis: whether the Defendants used excessive force in violation of the Plaintiffs' constitutional rights. The Court finds the Defendants' use of force was objectively reasonable and proportionate. Because Plaintiffs have not created an issue of material fact as to whether the use of force violated the Fourth Amendment, Defendants are entitled to qualified immunity.

To establish unconstitutional excessive force, Plaintiffs must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (citation omitted). The Defendants here do not challenge whether Plaintiffs have demonstrated sufficient injuries. *See* ECF No. 33 at 15 ("Any dispute over the extent of Michael's injuries would not necessitate trial because the use of force in removing Michael from the vehicle by his arms and shoulders was reasonable in the [circumstances]."); *id.* at 21–26 (not analyzing Alton or James's injuries). The Court thus assumes without deciding that Plaintiffs have at least established a genuine issue of fact as to whether their injuries are sufficient to sustain an excessive force claim. The inquiries into whether a use of force was "clearly excessive" or "clearly unreasonable" are intertwined. *Hanks*, 853 F.3d at 744. Thus, the Court considers those questions together below.

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on the facts and circumstances of each particular case." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (internal marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The inquiry in excessive force cases is objective, not subjective. *Id.* at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). And the "inquiry into the reasonableness of police force requires analyzing the totality of the circumstances." *Barnes v. Felix*, 605 U.S. 73, 80–82 (2025) (rejecting the "moment-of threat rule" previously applied in this Circuit). Factors to consider include (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest." *Graham*, 490 U.S. at 396.

### 1. Alton and James's Excessive Force Claims

Plaintiffs Alton and James allege Defendant Harris used excessive force against them when escorting them across the property. ECF No. 20 at 13–18. Because Plaintiffs' account of the events differs from the Defendants' account, the Court begins by considering the evidence to determine what happened. All reasonable inferences will be drawn in Plaintiffs' favor, unless Plaintiffs' version is clearly contradicted by the record, including the video evidence. *See Vann*, 884 F.3d at 309; *Scott*, 550 U.S. at 380–81.

Plaintiffs allege the physical altercation with Defendant Harris began when Harris kicked Alton in the legs. ECF No. 20 at 14; Pl. Ex. 8. But Alton's own Declaration contradicts this version of events—he alleges Harris elbowed him in the head, bringing him to the ground. Pl. Ex. 10. Plaintiffs further allege Harris struck James with his elbow while James "was re[s]trained with his hands behind his back." ECF No. 20 at 15. Harris, for his part, says Alton and James were "planting their feet and not walking forward." Def. Ex. A at 9. He says the men were "pushing back against him," and when Alton pushed his shoulder back into his chest he delivered a "distractionary blow" to prevent Alton from continuing to push

him. *Id.* Harris says James then assumed a posture as if to assault Harris, so Harris delivered a distractionary blow to him as well. *Id.*

The Court does not credit Plaintiffs' version of events as to the altercation with Alton, because it is contradicted by the record. *See Scott*, 550 U.S. at 380–81. Lieutenant Nuckols's body camera clearly shows Alton planting his feet and pushing back against Harris. Def. Ex. G at 2:00–06. This contradicts Plaintiffs' version of events, in which Harris begins the encounter by striking or kicking Alton unprovoked.[7] Further, still images from Defendant Copeland's body camera show that Alton did not go to the ground during his interaction with Harris, at least not for any significant period of time. Def. Ex. M. This contradicts both Alton and James's account of the events. Thus, as to the altercation with Alton, the Court credits the version of events supported by the video record. While Harris was escorting Alton and James, Alton resisted the escort and began pushing back against him. After multiple verbal attempts to obtain Alton's compliance, Harris struck him once with his elbow to prevent further resistance and to obtain compliance. *See* Def. Ex. F at 08:50–09:25; Def. Ex. G at 02:00–06; Def. Ex. M.

As to the altercation with James, Plaintiffs' account is not clearly contradicted by the record, including available video. Defendant Harris claims he elbowed James in response to a threatened assault. While Defendants' version is not clearly contradicted by the record, it is not clearly supported either. Thus, drawing all reasonable inferences in Plaintiffs' favor, the Court assumes for now that Harris struck James without any direct threat from James.

The Court now considers the three *Graham* factors. The first *Graham* factor—the severity of the crime at issue—favors Defendants. Plaintiffs argue this factor favors them

---

[7] The internal inconsistency of Plaintiffs' Declarations as to how Harris initiated the altercation—submitted *by them* as evidence—further supports the Court's decision not to credit their accounts on this point.

because "James and Alton were not arrested or charged for anything related to their interaction with Defendant Harris, which is the issue at hand." ECF No. 40 at 25. But the first *Graham* factor requires considering the severity of the crime that led to the encounter, not subsequent charges arising from the encounter. In cases involving apprehensions during the execution of a warrant, courts consider the severity of the crime underlying the warrant. *Darden v. City of Ft. Wor., Tex.*, 880 F.3d 722, 729 (5th Cir. 2018). And the severity of the crime weighs *against* excessive force where the apprehension occurred while executing a warrant related to drugs. *Id.* Here, the search warrant was related to the distribution of drugs. Def. Ex. B. Alton and James admit they faced drug charges, and Alton also faced a firearm charge. ECF No. 40 at 25. Thus, the first *Graham* factor weighs against excessive force.

The second *Graham* factor is whether the suspect poses an immediate threat to the safety of officers or others. This factor also favors Defendants. Alton and James argue they did not pose an immediate threat because they complied with officer instructions when initially being apprehended. ECF No. 40 at 25. The video record casts some doubt on this claim—Alton resisted at least somewhat to initially being handcuffed. Def. Ex. E at 02:15–25. But regardless, even if their previous compliance favors James and Alton when considering the totality of the circumstances, they still posed a risk to Harris at the moment of the altercation. *See Anderson v. Estrada*, 140 F.4th 634, 644 (5th Cir. 2025) (earlier compliance does not negate later threatening conduct). And the fact that they were handcuffed does not mean they could not pose a threat to Harris. *See id.* This is especially true given Harris was outnumbered, at least at the start of the interaction. *See* ECF No. 40 at 18 (Plaintiffs acknowledging that an officer being outnumbered two to one weighs in the officer's favor in the *Graham* analysis). As to Harris's strike against James, even though the

Court assumes James did not threaten Harris, this factor still favors Harris. When an officer is outnumbered and facing force and resistance from other people, reasonable force against a suspect who is not actively resisting or using force himself does not violate the Constitution. *See Craig v. Martin*, 49 F.4th 404, 410 (5th Cir. 2022). And while the risk Alton and James posed to Harris may have been minor, his response—one strike to each of them—was proportionate. *See Bartlett*, 981 F.3d at 332–33 (officer's response should calibrated to actions of the plaintiff). Thus, the second *Graham* factor weighs against excessive force.

The third *Graham* factor considers whether Plaintiffs were resisting and also favors Defendants here. Alton was digging his feet into the ground to resist moving in the direction Harris wanted him to move. And even if James was not engaged in the same behavior, he was verbally resisting Harris's commands in an aggressive way. Def. Ex. F at 09:00–25. While the resistance may have been somewhat minor, it was resistance *See Solis v. Serrett*, 31 F.4th 975, 982 (5th Cir. 2022) (a suspect who merely backs away from an arresting officer is actively resisting). Because Alton and James were resisting, the third *Graham* factor weighs against excessive force.

Taking these considerations together, Harris did not use excessive force against James and Alton. Each of the three *Graham* factors favors Harris. Given the Plaintiffs' resistance and threat to Harris, his calibrated response of striking them once each to regain compliance and ensure his safety was not "clearly excessive" or "objectively unreasonable." Thus, Plaintiffs have failed to establish a genuine issue of fact as to whether Harris used excessive force against them. *See Ramirez*, 716 F.3d at 377.

**2. Michael's Excessive Force Claims**

Michael alleges Defendant Wheeler used excessive force against him when Wheeler pulled Michael out of his truck and dragged him a short distance along the ground. ECF No.

20 at 6–7. He further alleges Defendants Rice and Cochran used excessive force against him when they aggressively pulled him from the ground and dragged him a short way when trying to move him to a different location. *Id.* at 9–13. Again, the Court draws all reasonable inferences in Plaintiffs' favor, unless Plaintiffs' version is clearly contradicted by the video evidence. *See Vann*, 884 F.3d at 309; *Scott*, 550 U.S. at 380–81.

The first *Graham* factor—severity of the crime—supports Defendants for the same reasons as Alton and James's claims. To be sure, Michael was *not* arrested for any crimes related to the drug search, unlike Alton and James. *See* ECF No. 40 at 17. But the proper subject of the first *Graham* factor in a warrant context are those implicated by the warrant (here, Alton and James). *See Smith v. Lee*, 73 F.4th 376, 385 (5th Cir. 2023). The officers apprehending Michael did not know whether Michael was involved in the drug operation at the time of his apprehension. For that matter, they did not even know Michael's identity—for all they knew, he could have been James or Alton. Thus, the severity of the crime weighs against a finding of excessive force.

The second *Graham* factor—whether defendant poses a risk to the officers or others—weighs strongly in Defendants' favor. Two major factors are important when considering the risk Michael put the officers in. First, in the moments immediately preceding the disputed encounters, Michael drove a vehicle directly at the Randall County SWAT unit. He did so despite their clear instructions to stop. He even kept driving toward them after they deployed a "flash bang device" and a "40mm less-lethal round" at or near the oncoming truck. ECF No. 33 at 26. Michael *never* voluntarily stopped driving toward the SWAT unit—he only stopped when an unmarked truck ran into him, forcing him to stop. Even then, *Michael* never applied the brake and *never parked the truck. See* Def. Ex. E at 06:10–20 (truck continues rolling after Michael is removed). Plaintiffs argue that Michael did *not* place the officers at risk

because he drove at a "very, very slow speed." ECF No. 40 at 17. While this might mitigate to some degree the risk presented directly by the truck, it does little to reduce the risk perceived by officers from a suspect who was completely undeterred by multiple attempts to stop him.

Second, while all this was happening, the officers faced another possible threat from the man in the crane. Contra Plaintiffs' assertion (ECF No. 40 at 20), the crane is *clearly* in the line of sight from the area where Michael was detained. Def. Ex. E at 05:07–18.[8] Immediately before Michael drove his truck at them, the SWAT unit members were assessing how to deal with the threat and taking precautions lest the man in the crane begin shooting at them. *See* Def. Ex. F at 09:45–10:10. While Michael was being detained, SWAT unit members positioned themselves between Michael and the crane to protect Michael and the officers detaining him from a potential threat from the crane. *See* Def. Ex. D. at 12:00–15. One man was even holding a shield. *Id.*

Plaintiffs advance various arguments that the Court should *not* consider the threat from the man in the crane when analyzing whether Defendants used excessive force, but none have merit. First, they argue many units were concerned about the crane, including a surveillance helicopter. ECF No. 40 at 19. It is not clear to the Court how this argument helps Plaintiffs—in fact, it tends to make the threat from the crane appear more serious. Moreover, a gunman in the crane could obviously cause massive damage with minimal warning. Next, they argue the evidence shows the man in the crane was unarmed. ECF No. 40 at 19–20. Of course, the officers did not know this at the time of Michael's apprehension, so it is irrelevant

---

[8] The Court finds it hard to believe the Plaintiffs' lawyers watched the same videos as the Court and genuinely concluded that "the crane does *not* appear to be with the line of sight" of the area where Michael was apprehended. ECF No. 40 at 20. The crane is clearly visible from the armored vehicle in the body camera footage while Michael is being arrested, and more importantly multiple SWAT unit members are taking defensive precautions against a potential threat from the crane. *See, e.g.*, Def. Ex. D at 12:07–14.

to the Court's analysis here. *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). Finally, Plaintiffs argue Defendants' concern about the threat from the crane is inconsistent during the execution of the search warrant. *Id.* at 20–21. Even assuming Plaintiffs are correct, the Defendants' inconsistency does not mitigate the real threat the officers perceived during Michael's apprehension.

The potential threat from the man in the crane is part of the "totality of the circumstances" the Court must consider when determining whether Defendants used excessive force. The potential threat contributes to the reasonableness of Defendants' decisions to act quickly and forcefully—they were concerned for the safety of themselves and Michael. Thus, Wheeler removed Michael from the vehicle quickly and aggressively from the vehicle, and Rice and Cochran moved him quickly and forcefully away from the area. Their actions caused some injury to Michael, but they thought they may have been removing him and themselves from the line of sight of a potential shooter. In another hypothetical scenario, under different facts, using this level of aggression with an elderly man might have been unreasonable. But "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The Court declines to second guess the reasonable decisions of officers facing multiple threats in a quickly evolving, dangerous situation, including a potential gunman. The risk to the officers and others strongly weighs against excessive force.

The third *Graham* factor—whether Plaintiff was actively resisting arrest—also favors Defendants. Michael ignored commands to comply from not one, but *two* tactical police units in armored vehicles. Despite loud sirens, repeated commands over the armored vehicles'

intercoms, and two rounds fired at his truck, Michael never voluntarily stopped driving his truck. Plaintiffs assert Michael suffered from "significant hearing loss" and suggest he therefore did not know police were trying to apprehend him. ECF No. 40 at 6, 17. Even assuming—perhaps beyond credulity—that Michael did not know the police were trying to apprehend him, the third *Graham* factor still favors Defendants. The reasonableness analysis is an objective analysis from the perspective of the officers. *See Graham*, 490 U.S. at 396–97. Thus, what matters is whether the Defendants reasonably could have thought Michael was evading arrest. Given Michael's actions, they of course could have. Plaintiffs further assert that Michael was "not actively resisting or attempting to evade by flight" because he put his hands in the air after crashing his truck into the SWAT unit truck. ECF No. 40 at 18. But Michael's raised his hands with his palms facing in toward him, a gesture more akin to confusion than surrender. And besides, a suspect who (1) flees from multiple armored police vehicles; (2) does not stop until a truck rams into him; and (3) never even parks his truck; and (4) refuses to comply with other police commands cannot plausibly claim he was "actively trying to surrender." The actively resisting arrest factor weighs against excessive force.

Taking these considerations together, the Defendants did not use excessive force against Michael. Each of the three *Graham* factors favors Defendants. Considering Michael's actions leading up to his detainment, and the threat officers perceived from the man in the crane, their decision to remove him from the truck and move him to a different area quickly was not clearly excessive or objectively unreasonable. Thus, Plaintiffs have failed to establish a genuine issue of fact as to whether Defendants used excessive force against Michael. *See Ramirez*, 716 F.3d at 377.

*B. Whether the Right at Issue was Clearly Established*

Although the Court concluded at prong one of the qualified immunity inquiry that the Defendants did not violate a constitutional right, it considers prong two in the alternative. Even if the Plaintiffs had created a genuine fact issue as to whether Defendants used excessive force against them, they have not shown that the right was "clearly established" at the time. Thus, Defendants are entitled to qualified immunity under prong two as well.

To overcome a qualified immunity defense, in addition to showing the Defendants violated the constitution, Plaintiffs must show "the right at issue was clearly established at the time of the alleged misconduct." *Morrow*, 917 F.3d at 874 (citation omitted); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal marks omitted)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (2015) (internal marks omitted).

The Plaintiffs' burden is heavy: "A right is clearly established only if relevant precedent 'ha[s] placed the . . . constitutional question beyond debate.'" *Morrow*, 917 F.3d at 874 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court's cases "teem with warnings about the difficulty of placing a question beyond debate." *Id.*; *see also generally, e.g., Ziglar v. Abbasi*, 582 U.S. 120 (2017); Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853 (2018). While Plaintiffs do not need to point to a case "directly on point," "existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The Supreme Court has repeatedly warned lower courts "not to define clearly established law at

a high level of generality." *Id.* at 742 ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.").

If that didn't set the bar high enough, "overcoming qualified immunity is especially difficult in excessive-force cases." *Morrow*, 917 F.3d at 876. "This 'is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)). And because "excessive-force claims often turn on 'split-second decisions' to use . . . force," the law must be "so clearly established that—in the blink of an eye—every reasonable officer would know it immediately." *Id.* (quoting *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009) (citation modified)).

Plaintiffs cannot meet the high bar of establishing that Defendants' conduct clearly violated their constitutional rights. Each Plaintiffs' primary argument is that *Graham* clearly established the right to be free from excessive force and the framework under which courts evaluate the reasonableness of force. ECF No. 40 at 23, 28. Plaintiffs' *Graham* argument does nothing more than establish the proposition that excessive force violates the Fourth Amendment, which "is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft*, 563 U.S. at 742. True, the Fifth Circuit has sometimes used *Graham* to supply "clearly established law" in qualified immunity analyses. *See Westfall v. Luna*, 903 F.3d 534, 549 (5th Cir. 2018). But *Graham* can only supply the clearly established law in "an obvious case." *Hanks*, 853 F.3d at 747. Outside of the obvious case, "clearly established law must be particularized to the facts of the case." *Id.* (internal marks omitted). This case, where multiple law enforcement agencies were executing a high-

risk search warrant and faced multiple threats and potential threats, is not "obvious" such that *Graham* can supply the clearly established law.

Michael argues *Joseph v. Bartlett* supplies clearly established law for his excessive force claims. ECF No. 40 at 24. But in that case, officers "inflicted twenty-six blunt-force injuries on [plaintiff] and tased him twice, all while he pleaded for help." *Bartlett*, 981 F.3d at 336. Michael's situation was far different: he had just crashed his truck into a police vehicle and was not following instructions, all while police faced the threat of a potential shooter in a crane. *Bartlett* does not establish that Defendants' conduct against Michael clearly violated the Fourth Amendment.

Alton and James argue *Ramirez v. Martinez* and *Bush v. Strain* supply clearly established law for their excessive force claims. ECF No. 40 at 28. But in *Ramirez*, an officer tased the plaintiff "while lying face-down on the ground in handcuffs." 716 F.3d 369, 373 (5th Cir. 2013). Moreover, the plaintiff had merely pulled his arm away from the officer. *Id.* at 378–379. Harris's use of force against Alton and James was more subdued (an elbow compared to a taser), *and* it was more justified by Alton and James's resistance and force. *Bush v. Strain* is even further afield. In that case, an officer "slammed [plaintiff's] face into a vehicle when [plaintiff] was handcuffed and subdued," resulting in significant injury and medical expenses. 513 F.3d 492, 501 (5th Cir. 2008). Here, the use of force and resulting injuries were significantly milder, and Alton and James were resisting and pushing back, not "subdued."

Plaintiffs point to no other cases showing the Defendants' conduct violated their clearly established right to be free from excessive force. Accordingly, they have failed to create a material fact issue as to whether Defendants' conduct violated a clearly established

constitutional right. Thus, Defendants are entitled to qualified immunity at step two of the analysis.

### II. Bystander Claims

"[B]ystander liability arises only where the plaintiff can allege and prove another officer's use of excessive force." *Buehler v. Dear*, 27 F.4th 969, 989 (5th Cir. 2022). Here, Plaintiffs' bystander claims are related to their allegations of excessive force against Michael. ECF No. 20 at 19–21. Because the Court finds no officer used excessive force against Michael, Plaintiffs' bystander claims fail as well.

### CONCLUSION

For the reasons above, the Defendants in this Motion are entitled to qualified immunity. Thus, their Motion for Summary Judgment (ECF No. 32) is **GRANTED** and all claims against them are **DISMISSED**. Alton Whetstone's claim against Unidentified Officer #3 remains pending.[9]

**SO ORDERED.**

September 11, 2026

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

[9] The parties did not present arguments about Alton's interaction with Unidentified Officer #3, who is not a party to this Motion. The Court cannot determine on this record whether Unidentified Officer #3 is entitled to qualified immunity.